STATE OF MISSOURI *ex rel.* NORTH AND SOUTH RAILWAY
COMPANY, Appellant, v. S. F. W. MEIER, President
of City Council of City St. Louis, Respondent.

St. Louis Court of Appeals, December 21, 1897; Motion
for Rehearing Overruled January 4, 1898.

Mandamus: POWER OF PRESIDENT OF CITY COUNCIL OF ST. LOUIS TO
WITHHOLD HIS SIGNATURE FROM BILLS LEGALLY ADOPTED: CITY CHAR-
TER IN RESPECT THERETO, CONSTRUED. The duty imposed upon the
president of the city council of the city of St. Louis, by a provision of
the city charter, of affixing his signature to all bills read and adopted
on their final passage, as therein prescribed, is not discretionary, but
purely ministerial, and mandatory, for a refusal to perform which a
writ of *mandamus* will lie to compel performance. *R'y v. Governor,*
23 Mo. *loc. cit.* 364; *State ex rel. v. Mead,* 71 *Id. loc. cit.* 271.

*Appeal from the St. Louis City Circuit Court.*—HON.
LEROY V. VALLIANT, Judge.

REVERSED AND REMANDED (*with directions*); Judge
BLAND concurring; Judge BIGGS dissenting in
separate opinion filed.

CERTIFIED TO SUPREME COURT.

BOND, J.—The relator seeks to compel the respond-
ent, who is president of the city council, to sign a bill
which it is claimed has legally passed that body, as well
as the house of delegates, and which confers upon the
relator the franchise to use certain streets of St. Louis
for street railroads. An alternative writ of *mandamus*
was issued, to which respondent made return admitting
his refusal to sign the bill in question, and alleging as
an excuse that it had failed to receive three readings on

three different days in the council, and that after amendment in the committee of the whole it was not again read. Other matters were pleaded in the return, but after issue taken thereon by reply the evidence was confined to the one relating to the sufficiency of the reading of the bill during its passage by the city council. The journal of the house of delegates, as well as of the council, was introduced by respondent. These show that the bill duly passed the lower house and was signed by its speaker, and that it was read in the upper house, as required by law, and received a majority of its votes on its final passage, but was not signed by its president. In addition to the recitals of the journal of the council, respondent introduced oral testimony showing that the bill was read at length in the council on May 25, 1897, by its title on May 28, again on July 13, and at length in the committee of the whole on July 20, at which latter date the council assembled and went into a committee of the whole for the purpose of considering it section by section, which was done, and in the course of which certain amendments were adopted, whereafter the committee rose and reported the bill to the council with recommendation that it pass, in pursuance of which the roll was called, resulting in the vote of nine members in favor of the bill and four against it. There was no adjournment or recess of the council on the twentieth of July, until after the vote on the passage of the bill, and no interruption in its session, except when it resolved itself into a committee of the whole; all of the members of the council were present during the whole time. The circuit court refused to award the peremptory writ, from which relator appeals.

There are only two questions in this case. *First.* Does the official character of the defendant exempt him from the writ, though the act to be performed is

MANDAMUS:
power of presi-
dent of city
council of St.
Louis to with-
hold his signa-
ture from bills
legally adopted:
city charter in
respect thereto,
construed.

merely ministerial? *Second*. Is the act in question discretional or ministerial? If the first inquiry is answered in the affirmative, it will not be necessary to discuss the second. The governor of this state is not amenable to *mandamus* for any acts of whatever nature required of him, either by the constitution or statutory law. His immunity in this respect is placed on the constitutional ground that he is the head of a co-ordinate branch of government. *State ex rel. v. Stone*, 120 Mo. 428. The same reasoning excludes the general assembly of the state in the discharge of its duties as such from the control of the courts by this or any other writ. But neither the case cited nor any just method of reasoning carries this privilege beyond the representatives of the executive and judicial departments of the government. The lesser functionaries of the executive department are amenable to the writ.

Neither can it be maintained that the officers of inferior legislative bodies created by statute are *virtute officii* beyond judicial control. It is clear, therefore, that the defendant in this case can not plead his position as speaker of the city council as a defense to this proceeding. Whether he is free from the control of *mandamus*, depends, not upon his office, but upon the nature of the duties with respect to which the right to the writ is asserted. If these involve any elements of discretion, the writ of *mandamus* can not be used to enforce their performance. If, however, they are solely ministerial, the writ may be employed against him in the same manner that it could be invoked against all other officials refusing to discharge like duties. This brings us to a consideration of the second question propounded in this opinion.

The duties imposed upon defendant in respect to affixing his signature to ordinances adopted by the house of which he is president, are specified in the following provisions of the charter of this city:

"No bill shall become an ordinance until the same shall have been signed by the presiding officer of each of the two houses in open session; and before such officer shall affix his signature to any bill, he shall suspend all other business, declare that such bill will now be read, and that if no objections be made, he will sign the same to the end that it may become an ordinance. The bill shall then be read at length, and if no objections be made, he shall, in the presence of the house, in open session, and before any other business is entertained, affix his signature, which fact shall be noted on the journal, and the bill immediately sent to the other house. When it reaches the other house, the presiding officer thereof shall announce the reception of the bill, and the same proceedings shall thereupon be observed, in every respect, as in the house in which it was first signed.

"If in either house any member shall object that any substitution, omission or insertion has occurred, so that the bill proposed to be signed is not the same in substance and form as when considered and passed by the house, such objection shall be passed upon by the house, and if sustained, the presiding officer shall withhold his signature."

This section, as far as it goes, is a substantial copy of section 37, article 4, of the state constitution. Its first clause requires the signature of the presiding officers of the two houses before the bill becomes an ordinance. The corresponding clause of the state constitution has been held to impose a mandatory duty. *State ex rel. The Attorney General v. Mead*, 71 Mo. 269. A similar construction must govern the similar charter

provision.   As it is thus seen to be mandatory it becomes necessary to ascertain its object and purpose.

A clear exposition of these is contained in the reasoning of Judge Scott in the case of *R'y v. The Governor*, 23 Mo. *loc. cit.* 364, where it is said in speaking of the constitutional requirement that the bills of the two houses of the state legislature should be signed by their respective presiding officers:   "This is the mode adopted for the authentication of every bill, and furnishes the evidence of its passage by the two houses in the first instance.   The governor's signature to a bill is not required as a means or part of its authentication, but as evidence of his approval.   The governor being no member of either house, and in contemplation of the constitution, not being present during their deliberation, could not know whether a bill had passed the two houses or not.   The constitution itself contemplated that there might be laws without the signature of the governor, and therefore the mode of authentication adopted was the evidence of the passage of all bills, in the first instance, by the two houses."

When the above language was used, this method of authenticating bills was directory under the constitution, and to-day it is mandatory.   The mere difference in the two constitutions as to the duty of performance does not change or alter the nature of the act to be performed.   It was prescribed solely as a method of authentication under the former constitution, and it retains the same character under the present constitution.

The character of the acts depends upon the reasons requiring it to be done, and not upon the kind of command, whether mandatory or directory, given for its performance.   This is recognized by Judge Sherwood in the case of *State ex rel. v. Mead, supra, loc. cit.* 271, by the following language:   "We are con-

vinced that the initial clause of the section that 'no bill shall become a law until the same shall have been signed by the presiding officer of each of the two houses in open session,' is mandatory, though it is quite evident that the mandate of the constitution would be obeyed, so far as concerns proper authentication of the bill, when it receives the signature of the respective presiding officers in open session." It being clear, then, that the object of this charter requirement is to secure the authentication, or due evidence of the genuineness of an enactment of the legislative body, how can it be rationally maintained that the act of signing bills for this purpose only involves any element of legislative action. Acts of legislation and acts of authentication are essentially distinct. All the legislative faculty of the council was spent when the bill was passed after its third reading upon a yea and nay vote of the house. What remained to be done thereafter was the duty imposed on the defendant as the presiding officer of that body to attest by his signature that the bill in question was the one adopted by the house. Such attestation was no part of the enacting force; it merely certified that the bill upon which it was placed was the one which had been subjected to that force. In other words, it recorded an antecedent fact which it in nowise caused. This being so, how can it be rationally urged that the speaker of the house exercises legislative discretion when a condition arises in the transaction of the business of the house requiring him to append his signature to a bill. The charter of the city specifies the conditions under which he shall perform this act. These are that no objections shall be made and sustained by the house. It will be noted that no power whatever is given to him to pass upon such objections. Their consideration is exclusively reserved for the house. If it fails to sustain

them, he is still required by the charter to sign the bill. It is not pretended in the case at bar that any objections to the passage of the bill were made or sustained by the council. Under these circumstances, what judgment or discretion was left to the defendant?

He pleads in his return that his signature was withheld because the bill did not receive the three readings required by law before its final passage. Granting for the argument, but not deciding that oral evidence was properly admitted under this plea, and granting further for the discussion that such objection can now be relied on, although there was no evidence that it was made and sustained by the house when the bill was passed, let us see what was shown by such evidence. This shows that the bill was unquestionably read, as required by law, provided the mode of its reading on the day of final passage was in accordance with the charter provision, *supra*. On the day in question the council convened, all of its members being present, resolved itself into a committee of the whole, and as such took up the bill, read and amended it fully, section by section, and reported the bill to itself as a council, and passed it by the requisite majority. Was the sufficiency or legality of this action a question to be conclusively decided by the president of the council? By no means.

It was, under the law, a matter for decision, *first*, by the council or a majority of its members, while engaged in the process of legislation; and *secondly*, after the promulgation of the bill as an existing law, it would become a matter for ultimate decision by the courts in the exercise of their power of determining the validity or invalidity of all laws. The mere personal opinion of the presiding officer as to the legal insufficiency of the reading of the bill, if unsustained by the council, was no warrant for his action in refusing to sign the bill after a carrying vote on its final passage. If it

rested with him to decide this question, the absurd consequence would follow that his individual notions of the law, however erroneous, would justify his action in blocking the wheels of legislation and preventing the enactment of the wisest and most useful measures. In the case at bar, the council as a body might have been called upon by due objection on the part of its president or any member to pass upon the sufficiency of the third reading of the bill. Neither he nor any other member saw fit to cause this to be done. The council as a body did in effect decide that this bill was duly read by passing it after a reading at length in the committee of the whole. That the members of the council, while so acting, termed themselves, according to parliamentary law, a committee of the whole, did not make them so sitting any less the house of which they were members. The very terms used, "committee of the whole," show that the *whole* council resolved itself into a committee for the dispatch of business without in any way losing its former character. That the action of such a committee is the action of the legislative body of which it is composed, has been expressly decided. Opinion to Senate, 9 Colo. 641. The distinction between the whole house in committee and the house itself is a fanciful one, and can not be sustained in reason or parliamentary law, and no case has been cited in support of the contention.

In our opinion, the only conclusion to be drawn from the testimony in this record, oral as well as documentary, is that the bill in question was read and adopted on its final passage in strict compliance with the charter provision, whereupon a specific duty, mandatory in character, was imposed on the defendant to authenticate this bill by appending his signature thereto, the record showing that no objection to such

act at the time was made and sustained by the council.
He, as any other member, was privileged to make such
objection and have a ruling of the house thereon.    This
not having been done, it became his imperative duty to
attest the bill as presiding officer.    Neither his opposi-
tion to the bill, nor his erroneous notions as to the suf-
ficiency of its various readings, warranted the withhold-
ing of his signature.    With the motives good or bad of
the members of the council in the exercise of the
sovereign power of making laws, neither the courts nor
respondent have any concern.    Responsibility as to all
such matters belong to the people who have the power
by their ballots to exclude evil doers from legislative
assemblies.    If the act of a miniature legislature, like
the city council, conforms to the requirements of the
law, it can not be defeated by the presiding officer of
that body in the exercise of his duty to authenticate.
The only way a bill, regularly passed by the two houses
of the municipal assembly, may be defeated, is by the
veto of the mayor or by the courts of the country after
it has passed into a law.    The notion that such a power
is vested in the presiding officer of a legislative body,
would lead to consequences destructive of a govern-
ment of laws.    For it is a maxim of free institutions
that the faculty of legislation resides in the majority of
the legislators, and if their will regularly expressed in
an enactment can be thwarted by the refusal of a single
member to authenticate the bill with his signature, then
the power to make laws rests, not in the body of rep-
resentatives selected by the people, but in the arbitrary
will of a single member.    Such a result can not have
been contemplated when the charter was adopted de-
fining the duties of the city law makers and their pre-
siding officers.    It is argued that the supreme court of
Alabama upheld a speaker of the state legislature in
withholding a bill from the governor which he thought

had not received a constitutional majority. The facts of that case show that the legislature, by vote of the house, decided that it had not passed the bill in question. It was accordingly held by the supreme court of Alabama that it could not coerce the judgment of the house and its speaker. That decision rested upon the plainest constitutional principles, that the sovereign power of the law making body could not be controlled in the process of legislation, and in exercising its constitutional rights to pass and transmit bills to the governor.

In the case at bar the council did not sustain the action of the presiding officer in refusing to sign its bill, hence no question is presented as to the right to compel an officer of a legislative body to perform an action which the house decided should not be done. Moreover, the duties of the president of the city council are not prescribed by the constitution, but are the mere specifications of the statutory law. There is therefore no analogy between the facts or the principles involved in the case cited and the one at bar. Neither is there any force in the suggestion on the argument that the defendant was compelled by his oath of office to exercise legislative judgment in the performance of the manual and ministerial duty of attesting bills passed by the city council. He took the same oath of office which the other members were required to subscribe. It rightfully governed him in the discharge of his legislative duties as it presumably governed them. Doubtless it influenced him in his vote against the bill in question, but it did not warrant his refusal to sign the bill after it was passed and when he had no further legislative duties to perform. Such a construction of the oath of office, as we have seen, would annihilate the power of the council to legislate against the will of its presiding officer.

Under the facts and circumstances in this case, we think the relator has established his right to a peremptory writ of *mandamus*. The judgment of the circuit court will therefore be reversed and the cause remanded, with directions to award a peremptory writ requiring the defendant to sign the bill in question. It is so ordered. Judge BLAND concurs; Judge BIGGS dissents.

BIGGS, J. (*dissenting*).—The theory of our government, both state and national, is, that the three co-ordinate branches thereof, viz., the judicial, legislative and executive, are supreme within their respective constitutional limits. In practice this is only true in a measure, for the courts may declare a law to be unconstitutional or set it aside because in its passage the requirements of the organic law were not observed. But this is the limit of the jurisdiction as to matters pertaining to the legislative branch of the government. Hence, in my opinion, it is without the jurisdiction of the court to interfere with or in any manner direct a legislative officer in the discharge of any duty devolving upon him, however formal it may be. In other words, legislative officers, in discharging their functions, never act ministerially. Thus it is beyond the power of a court to compel the president of the senate or the speaker of the house to sign a bill. The signing is an act of legislation, and if courts can compel the performance of this act, this would be legislation on their part. This is in line with the views of the supreme court in *State ex rel. v. Stone*, 120 Mo. 428, wherein it was held that the governor of the state could not be compelled by *mandamus* to perform any duty pertaining to his office. In the application of this rule it may very well be argued that there is no distinction between the position of the defendant, as president of the council, who is a statutory officer, and the presi-

dent of the senate, who is a constitutional officer. But conceding that there is a distinction, and that the defendant may be compelled to perform a ministerial act, still, the act must be purely ministerial. However formal the act may be, if there is the least degree of discretion vested in him, *mandamus* will not lie. In the majority opinion it is decided that the signature of the defendant was only required for the purpose of identifying the ordinance. This was one of the purposes, but not the only one, for if it was, then it would have been much more appropriate to have required the signature of the clerk of the council to the ordinance. But as stated by the learned judge who tried the case: "The law has prescribed when and under what circumstances the bill should be signed, and by imposing that duty on the president of the council necessarily calls for the exercise of his judgment as to whether or not all the requirements of the law in its passage have been complied with. This raises the signing of the bill above a mere ministerial act and makes it an act of legislation." There is nothing in the case of *R'y v. Governor*, 23 Mo. 264, contradictory of this view. Of the cases cited, none approach so near the case at bar, as to the facts, as that of *Ex parte Echols*, 39 Ala. 698. By the constitution of Alabama it required a two thirds vote to pass a bill dividing a county. A bill of the kind was pending in the house and received the votes of two thirds of the members *present*. The speaker decided that the bill was lost for the reason that in his opinion the constitution required the affirmative votes of two thirds of *all* the members. There was an appeal to the house from his decision, in which he was sustained.

Thereupon one of the members of the house applied for a writ of *mandamus* to compel him to sign the bill and send it to the senate. The peremptory

writ was denied. The supreme court in its opinion said: "The speaker decided that the bill had not passed by a vote of two thirds of that branch of the legislature, and an appeal was taken from that decision to the house and the house sustained the decision of the speaker. This was a question certainly within the jurisdiction of the speaker and house to pass upon, and is not a mere ministerial duty, but one that pertains to their legislative functions, and is one over which the house has exclusive jurisdiction. No other department of the government can review its action in this respect without a usurpation of power." The fact that the decision of the speaker was concurred in by the house is of no importance. If the speaker had the right to decide the question, the affirmance of his judgment by the house added nothing to its validity. The similarity of the two cases is that both officers refused to sign the bills for the reason that they had not in their opinion been legally passed. In the Alabama case the speaker of the house decided that the bill had not received the requisite vote. In the case here the defendant decided that the ordinance had not been read before the council on three separate days as required by the charter, and therefore had not been legally adopted.

Although it be conceded that the defendant is amenable to the writ, and that the affixing of his signature is a purely ministerial act, yet under the circumstances the circuit court properly denied the peremptory writ, for the reason that the ordinance was not read before the council on three separate days. The oral evidence clearly show this to be true. In America the writ of *mandamus* is demandable as a matter of right, but as many courts have decided, is "grantable at discretion," that is, it should not be issued in cases of doubtful right.

This is the doctrine of all the cases. *State ex rel.*

*v. R. R.*, 77 Mo. 143; High, Ex. Rem., sec. 9; *School Dist. v. Gooding*, 120 Mo. 67; *State v. Williams*, 99 Mo. 291; *State v. Newman*, 91 Mo. 445; *Wear v. Water Works Co.*, 2 Rus. & M. 470; *Waldron v. Lee*, 5 Pick. 323; *Com. v. Canal Co.*, 2 Pen. & W. 517; *People v. Hatch*, 33 Ill. 9; *Free Press v. Nichols*, 45 Vt. 7; *People v. Forquer*, 1 Ill. 68; *Effingham v. Hamilton*, 68 Miss. 523; *Collins v. State*, 8 Ind. 344; Moses, Mandamus, p. 18.

Thus in the *Gooding* case, *supra*, the court refused to compel a county clerk to extend taxes upon the tax books when such taxes were not legally assessed. In the *Forquer* case, *supra*, it was sought to compel the defendant, who was the secretary of state, to countersign a commission issued by the governor to the relator as paymaster general of the state. The court decided that the governor had issued the commission without warrant of law, and for that reason it declined to compel the defendant to perform the ministerial act. To the same effect is *Collins v. State, supra*. In the case at bar the parol evidence conclusively shows that the ordinance was read but once before the council. Afterward, it was read twice by its title, and in the committee of the whole it was read by sections and amended, and on the same day was put on its final passage without engrossment and without being read before the council as such. The reading by the title is attempted to be justified on the ground that it is customary in legislative bodies to read bills by their titles, and that reading a bill by its title is in legal contemplation a reading of the bill. This is the rule in the enactment of laws by congress, and it is claimed that the practice is in vogue in the legislature of the state. The answer to this is that congress is free to make its own rules, and that the violation of the constitution by the state legislature furnishes no legal

excuse for the violation of the charter by the city council of the city of St. Louis. Judge DILLON, in his work on municipal corporation, says that "when the mode of enacting ordinances is prescribed, it must be pursued." 1 Dillon, Mun. Corp., sec. 309. The provision in the charter of the city of St. Louis requiring ordinances to be read on three different days is mandatory. It is not a mere rule of procedure, but is intended to prevent hasty and unwise legislation. This object would not be attained by reading an ordinance by its title.

For the reasons stated, I think that the judgment of the circuit court ought to be affirmed.

### ON MOTION FOR REHEARING.

BLAND, P. J.—The attempt to dignify the office of president of the council of the city of St. Louis with that of governor of the state of Missouri, and thus bring this case within the reasoning of the opinion in *State ex rel. v. Stone*, 120 Mo. 428, must fail. Missouri is a sovereign state, with a constitutional form of government, which divides the functions of government into three co-ordinate branches, each independent of the other, and each prohibited from usurping the functions of the others. The city of St. Louis is not a sovereignty; it is but a political subdivision of the state invested by its charter with certain powers, among which is to pass ordinances on certain named subjects and in harmony with the constitution and laws of the state. It was chartered, not as a department of the state government or as a branch thereof, but as an auxiliary thereto. The power to pass ordinances is given to all the municipal corporations of the state, and in point of dignity of office the municipal officers of the city of St. Louis are not above those of any of the

other incorporated cities of the state. They are not officers of the state, have not entrusted to them any of the powers or duties of state officers; they are but the officers of a municipal corporation entrusted with certain local duties and powers for the purpose of securing a more perfect local self government to the inhabitants of the city; and this court held in the case of *State ex rel. v. Noonan*, 59 Mo. App. 524, that the highest officer of this municipality, to wit, the mayor, is amenable to the writ of *mandamus*. The case of *State ex rel. Attorney General v. Mead*, 71 Mo. 268, so far as it has any application to the case in hand, holds that the initial clause of section 37, article 4 of the state constitution, that "no bill shall become a law until the same shall have been signed by the presiding officers of each of the two houses in open session, is mandatory." The initial clause of section 32, article 3 of the city charter is that "no bill shall become an ordinance until the same shall have been signed by the presiding officers of each of the two houses." If the duty of signing bills by the presiding officers of the two houses of the general assembly is mandatory under the provisions of section 37, article 4, of the constitution, then under a like provision in the city charter the duty of the presiding officers of each of the two houses (the assembly and council of the city of St. Louis) is mandatory. In other words, the respondent in this case has no discretion to sign or not to sign a bill passed by the city council over which he presides. When a bill has been duly passed by that body, it is his duty to sign it. Suppose he refuses, then what? Must the bill fail to become an ordinance for want of his signature? Is the state through its courts without power to compel him to do his duty?

If so, then a great mistake was made by the voters of St. Louis when they adopted the scheme and charter,

for while they were securing the power and privilege of local self-government, they at the same time unwittingly created an officer with power to defeat every object of the charter, and to destroy the government of the city, for without money the city can not be policed; it can not be supplied with light and water; the streets can not be cleaned or improved; the sanitary department can not be maintained; the city's charitable institutions can not be kept up; the officers of the city can not be paid their salaries and fees; money can not be had without a bill appropriating it, and a bill can not become an ordinance without the signature of the president of the council. The contention that the speaker exercises a legislative function by signing a bill, is not tenable. When he calls up a bill, suspends all other business that the bill may be read, and if no objections are made that he may sign it, to the end that it may become an ordinance, and the bill is read and no objections are made by the speaker or any member of the house, the functions of legislation on that bill in the council are exhausted. How can it be said that the president in signing a bill exercises a legislative function when the duty is mandatory, as was held in *State ex rel. v. Mead, supra.* A legislative act requires the exercise of judgment, volition and discretion; a mandatory act is one which the party must do, is compelled by law to do; for the same reason the act is not judicial, for it can not be both judicial and mandatory. Hence he can not look behind the bill or the journal and determine for himself whether the charter has been complied with in the passage of the bill. In affixing his signature to the bill, he is the attesting and certifying officer of the council. The signatures of the presiding officers of the two houses, with the approval of the mayor indorsed thereon, is made the evidence of the fact that the bill has passed the two houses, re-

ceived the approval of the mayor, and is an ordinance, and no further authentication or evidence of the fact is required.    The purpose subserved by its signature is to attest and authenticate.    This he must do when the council has passed a bill, and whenever he refuses to perform this ministerial duty, *mandamus* is the appropriate remedy.

The motion for a rehearing with the concurrence of Judge Bond is denied.

### ON MOTION TO CERTIFY TO SUPREME COURT.

BIGGS, J.—It is conceded that in the performance of their official functions the legislative officers of the state are not subject to the control of the courts.    This necessarily follows from the reasoning of the supreme court in the case of *State ex rel. Robb v. Stone*, 120 Mo. 428.    Counsel for respondent insists that the majority opinion in the present case is opposed to the decision of the supreme court in the case cited.    If there is no substantial difference between the general assembly of the state and the municipal assembly of the city in respect to the making of laws, then in my opinion this contention of counsel is well founded.    When I wrote the dissenting opinion, I entertained some doubt as to this proposition, for if I had been satisfied that the distinction did not exist, I would have then asked that the case be certified to the supreme court.    I will now discuss the question in light of the authorities.

Judge DILLON, in his work on municipal corporations, says: "Although the proposition that the legislature of a state is alone competent to make laws, is true, yet it is also settled that it is competent for the legislature to delegate to municipal corporations the power to make by-laws and ordinances, which, when authorized, have the force, as to persons bound thereby,

of laws passed by the legislature of the state." Dillon, Mun. Corp. [2 Ed.], sec. 245.

The principle of this text has been often recognized and enforced by the supreme court of the state. In *Taylor v. Carondelet*, 22 Mo. 105, Judge Scott said: "The legislature delegated its legislative power over to the corporation, and the corporation, within the sphere of its delegated power, could act as authoritatively in relation to it as the legislature. The law-making power, in fact, made the board of trustees a miniature general assembly, and gave their ordinances on this subject, the force of laws passed by the legislature of the state."

In speaking of city councils it was said in *St. Louis v. Foster*, 52 Mo. *loc. cit.* 515: "Their charters are their constitutions, which authorize councils to act, and a city council is a miniature general assembly, and their authorized ordinances have the force of laws passed by the legislature of the state."

In *State v. Vic DeBar*, 58 Mo. *loc. cit.* 397, Judge Lewis said: "*The* municipal ordinances and the state statutes *are from a common source of authority. One class presents it in a delegated, and the other in a direct form, but it is the power of the state which speaks in both.*"

In *R. R. v. R. R.*, 105 Mo. *loc. cit.* 575, Judge Black said: "Authorized ordinances, duly enacted, have the force and effect of laws, etc."

In *Jackson v. R. R.*, 118 Mo. *loc. cit.* 218, 219, Judge Gantt said: "It is well established that the residents within a municipality must take notice of the ordinances, and it is frequently stated that ordinances have the force and effect of laws within the limits of the corporation."

Judge Sherwood said: "But the passage of an ordinance is of course a *legislative* act." * * * *Moore v. Cape Girardeau*, 103 Mo. *loc. cit.* 476.

Under the foregoing authorities it is settled that the general assembly of the state may delegate to the legislative bodies of municipal corporations the right to enact local laws or ordinances, and that such ordinances, when regularly passed, have locally the force and effect of acts of the legislature. The legislature has delegated this authority to the municipal assembly of the city of St. Louis, and the charter throws around this legislative body all the constitutional safeguards against hasty legislation. In its organization and mode of enacting laws it is the exact counterpart of the legislature itself. As some of the cases state it, it is in fact a "miniature legislature." It has an upper and lower house corresponding with the upper and lower house of the general assembly of the state. The house of delegates, like the house of representatives, is presided over by a speaker chosen from its own body. The council, like the state senate, is governed by a president, who is elected by the people. In the passage of laws both bodies are governed by the same restrictions, and like duties are imposed on their respective presiding officers. (Art. 3, sec. 22, charter of city of St. Louis; art. 4, sec. 37, Const. Mo.) Now, if the officers of the legislature as to their legislative functions are beyond the control of the courts, by what show of reason can it be said that the officers of the subordinate body (to which the legislature has delegated a portion of its powers) are within such control? The answer to this must be that the municipal assembly in the enactment of laws exercises within its sphere the functions of the legislative branch of the government, and that its officers in the discharge of their legislative duties, like the officers of the legislature itself, are beyond the interference of the courts. Hence I am of the opinion that the decision in this case is opposed to that in the case of *State v. Stone,*

*supra*, and for that reason the cause ought to be certified to the supreme court for final determination, and I ask that this be done.